# IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF MISSOURI

In re:                                    )
                                          )
**AMERICAN TRAILER & STORAGE, INC.,**     )        **Case No. 08-43929-DRD**
                                          )
                 Debtor.                  )        **Chapter 11**

## MEMORANDUM OPINION

This matter came before the Court for hearing August 21 and August 25, 2009 on the First

Amended Plan of Reorganization, as amended, (the "Plan")[1] filed by American Trailer & Storage,

Inc. ("Debtor"). Debtor's largest secured creditor, Bank of the West ("BOW") voted against the

Plan and filed an objection to confirmation. BOW objected to the Plan on a number of bases. The

following issues remain before the Court regarding confirmation of the Plan: (1) whether the Plan,

as amended, satisfies 11 U.S.C. §1125, or whether Debtor should be required to submit an amended

disclosure statement and re-solicit votes based on the same; (2) whether the Plan is feasible; (3) what

the appropriate rate of interest is for BOW's claim, (4) whether the Plan impermissibly strips BOW

of its lien rights; and (5) whether the Plan is discriminatory among creditors. The Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and (b). This is a core

proceeding which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(L). This

opinion contains the Court's Findings of Fact and Conclusions of Law as required by Rule 52 of the

Federal Rules of Civil Procedure made applicable to this proceeding by Rules 7052 and 9014(c) of

the Federal Rules of Bankruptcy Procedure. For all the reasons stated below, the Court will confirm

---

[1] Debtor filed a Motion for Determination Pursuant to 11 U.S.C. § 1127(c) that Plan Amendment to First Amended Plan of Reorganization Satisfies the Requirements of 11 U.S.C. §1125 and Request that Same be Heard at Confirmation Hearing ("Motion"). Debtor has filed subsequent amendments to its Plan, all of which are incorporated in Debtor's Exhibit 26.

Debtor's Plan as amended.[2]

## I. FACTS

Debtor is in the business of buying and selling, renting and leasing portable storage containers and semi-trailers.   Debtor commenced this case by filing a voluntary petition under Chapter 11 on September 23, 2008.  During the case, Debtor has remained in possession.  Debtor has continued to use the revenues generated from its assets in the ordinary course of business pursuant to the court-approved cash collateral order that Debtor negotiated with BOW.

On June 15, 2009, Debtor filed its Second Amended Disclosure Statement and First Amended Plan of Reorganization.  By an order entered June 24, 2009, the Court approved Debtor's Second Amended Disclosure Statement.  Debtor then disseminated the amended order approving the disclosure statement, the first amended plan, the second amended disclosure statement and the ballot to all parties in interest in the case.  The Debtor has subsequently amended its First Amended Plan of Reorganization several times and has moved the Court to determine that said modifications were made pursuant to 11 U.S.C. §1127(c), and that the Plan modifications satisfy the requirements of 11 U.S.C. §1125.

BOW is the only secured creditor that objected to the Plan.  The remaining secured creditors have minor claims compared to that of BOW.  The Plan proposes to pay BOW's claim in the total amount of $5,583,964.21,[3] at the interest rate of 5% per annum, or such other interest rate determined by the Court, based upon the evidence, to satisfy the requirements of 11 U.S.C. § 1129(a)(11) and (b) in monthly payments to amortize the principal balance over a 10-year

---

[2] See Debtor's Exhibit 26.

[3] BOW's filed claim amount is $5,897,894.81.  Debtor has filed an objection to this claim.

period, with a final balloon payment of any unpaid balance at the end of five years.  BOW has

objected to confirmation of the Plan.

## II.  DISCUSSION AND ANALYSIS

### A. Procedural Issues

In its objection to confirmation, BOW raises two procedural issues, which it argues

require the Debtor to resubmit an amended disclosure statement for Court approval and then re-

circulate it and an amended plan to creditors for a re-vote.  The first issue raised by BOW is that

Debtor failed to give proper notice to creditors of the deadline for voting on the Plan.

Bankruptcy Rule 3017 states that the proponent of a plan is required to send a copy of the court

approved disclosure statement, the plan, and a ballot to each creditor entitled to vote.  Rule 3017

also advises that the court is required, on or before approval of the disclosure statement, to fix a

time within which creditors may accept or reject the plan.  Pursuant to Bankruptcy Rule 2002(b),

creditors are entitled to 25 days notice of the deadline for filing objections to confirmation of the

plan.

In this instance, the Court issued the Amended Order Approving Debtor's Second

Amended Disclosure Statement on June 24, 2009, and set the confirmation hearing for August

21, 2009.[4]  Pursuant to the Court's order, the deadline for voting on the Plan was set for August

14, 2009.  BOW objects as a procedural matter because the deadline for accepting or rejecting

the Plan on the ballot submitted to creditors was August 5, 2009 instead of August 14th.  BOW

does not argue that creditors were necessarily prejudiced by this error, but rather, that strict

---

[4] See Docket No. 182.  The Court entered a previous order approving Debtor's Second Amended
Disclosure Statement on June 19, 2009, however, this order was amended by the June 24, 2009 order.

3

compliance with Rule 3017 is mandated and re-solicitation of the disclosure statement with a

new deadline for voting is the only appropriate remedy.  BOW does not argue that creditors did

not receive the required 25 days notice because it could not.  The amended order approving the

disclosure statement and establishing deadlines for filing ballots and objections was entered on

June 24, 2009, and served by Debtor on June 26, 2009, 40 days before the voting deadline set

forth in the ballot and 49 days before the ballot deadline established by the Court.

Debtor asserts that this error caused absolutely no prejudice to creditors and BOW is

simply attempting to buy additional time to get its own disclosure statement and plan on the table

for creditors to consider.[5]  Debtor states that it  remedied its error by quickly identifying it and

promptly notifying creditors.  Upon realizing that there was an error, on August 2, 2009, Debtor

sent all creditors entitled to receive notice, a notice of its intent to honor ballots received through

August 14, 2009, and filed the same with the Court.[6]  The evidence is that Debtor received

ballots after the erroneous August 5th deadline and counted the same as valid and timely.

Additionally, the error was corrected by BOW's own solicitation letter to creditors which

identified the correct deadline of August 14, 2009.  Additionally, Debtor's Certificate of Service,

which was mailed to all parties entitled to vote, included along with the ballot and the first

amended plan, the Amended Order Approving Second Amended Disclosure Statement and

Setting Hearing, which sets forth the proper August 14th deadline for submitting votes.[7]  The

Court finds that Debtor's swift identification of the error and prompt steps taken to correct it, and

---

[5] On July 31, 2009, BOW submitted a Disclosure Statement and Plan for the Court's
consideration and subsequently withdrew the same on September 28, 2009.

[6] See Docket No. 205.

[7] See Docket No. 182.

4

the fact that Debtor counted ballots as valid and timely *after* the erroneous deadline, in addition

to the Court's Order and BOW's solicitation  letter, sufficient to ensure that the integrity of the

voting process was not impaired and that re-solicitation of a new disclosure statement and the

amended version of the Plan, based solely on this discrepancy, is not warranted.

　　　　The second procedural issue raised by BOW is whether Debtor should be required to

obtain court approval of a modified disclosure statement and re-circulate the same along with its

amended Plan for re-voting pursuant to §1127(c).  Section 1127 of the Bankruptcy Code allows

pre-confirmation plan modifications if the modified plan otherwise complies with classification,

content, and disclosure requirements.  *See* 11 U.S.C. § 1127(c)[8], 11 U.S.C. §§ 1122, 1123, 1125.[9]

If modifications made to a plan prior to confirmation (but after the ballots have been counted)

are minor, impact only a creditor who has been fully involved, and do not adversely impact any

other creditor, then it is not necessary to solicit new acceptances.  *In re Sentinel Mgmt. Group,*

*Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Il.2008) *citing Fairfax Savings v. Sherwood Square Assocs.*

*(In re Sherwood Square Assocs.*), 87 B.R. 388, 390 (Bankr. D. Md.1988).  A new disclosure

statement is not necessary every time a modification is made; if the modification is minor, the

existing disclosure statement will suffice.  *In re Concrete Designers, Inc.*, 173 B.R. 354, 356

(Bankr. S.D. Ohio1994).  The Bankruptcy Code is designed to encourage consensual resolution

---

[8] The proponent of a modification shall comply with §1125 of this title with respect to the plan as modified.  11 U.S.C. §1127(c).

[9] The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.  11 U.S.C. §1127(a).

of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications. *In re Rhead*, 179 B.R. 169, 176 (Bankr. D.Ariz.1995). The rules applicable to such modifications should be read and interpreted consistent to that end. *In re Jartran, Inc*., 44 B.R. 331, 363 (Bankr. N.D. Ill.1984). However, if a modification materially and adversely affects any of the voting parties' interests, who previously voted for the plan, they must be afforded an opportunity to change their vote. *In re Am. Solar King Corp*., 90 B.R. 808, 825 (Bankr. W.D. Tex.1988). "A modification is material if it so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance." *Am. Solar King*, 90 B.R. at 824 *citing* 8 *Collier on Bankruptcy*, ¶ 3019.03, p. 3019-3 (15th ed. 1987). The severity of the modification need not be such as would motivate a claimant to change its vote, rather, the question is whether it would be likely to reconsider the prior acceptance of the plan. *See Am. Solar King*, 90 B.R. at 824.

In this case, the primary modification at issue is a change in the interest rate proposed to be paid to BOW. In the Plan which was submitted to creditors for voting, the rate of interest proposed by the Debtor was 3.97% per annum. Thereafter, on or about August 11, 2009, Debtor filed an amendment to its Plan, which modified the rate of interest to be paid to BOW to "5% per annum, or such other interest rate determined by the Court, based upon the evidence, to satisfy the requirements of 11 U.S.C §1129(a)(11) and (b)...."[10] At the heart of BOW's argument is that Debtor should not be allowed to modify the interest rate in such a way that could potentially render the Plan infeasible without first re-circulating an amended, court approved disclosure statement, which includes said proposed amendment for a re-vote. Its argument is, because the

---

[10] Debtor's Exhibit 26.

modification allows the Court to pick a new interest rate, which could be a percentage that is too

high for the Plan to still pay out all creditors 100%, that the modification is therefore, clearly

material and warrants a re-ballot. The problem with this argument is that the language in

Debtor's amendment specifically provides that the Court must determine an interest rate *that*

*satisfies the requirements of §1129(a)(11)*, or in other words, it must still make the Plan feasible

or "workable," such that all creditors, including BOW, are still going to be paid pursuant to the

Plan. Therefore, if the only modification at issue is a percentage rate on a claim for a creditor,

which has been involved throughout the entire confirmation process, and which in fact did not

even vote in favor of the Plan to begin with, the modification specifically states that the Court

must pick a rate that maintains the Plan's feasibility pursuant to §1129(a)(11), the Court sees no

purpose in requiring the Debtor to re-circulate a disclosure statement and the amended Plan for

seemingly no other purpose than to solicit a second rejection ballot from BOW. Debtor's other

creditors received notice of the modification of the interest rate, as well as the other

modifications to the Plan, and did not file an objection or appear at the confirmation hearing or

otherwise seek to change their vote. Based on the fact that no creditor, other than BOW, has

objected to the interest rate modification, or any of the modifications, or indicated any interest in

changing a vote, and on the fact that the interest rate modification language specifically states

that the Court must pick a rate that maintains the Plan's feasibility, the Court finds that re-

soliciting an amended disclosure statement would serve no purpose. The Court finds that the

amendments to the Plan are in compliance with §1125 and that re-circulation of an amended

disclosure statement and an amended Plan is unnecessary under the circumstances.

### B. Feasibility

Section 1129(a)(11) requires a finding by the court that confirmation of the plan is not

likely to be followed by the liquidation, or the need for further financial reorganization, of the

debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is

proposed in the plan. 11 U.S.C. § 1129(a)(11).  This statutory section establishes what is

commonly known as the "feasibility" requirement, and essentially requires the courts to

determine whether a plan is "workable" before it is confirmed.  *See Danny Thomas Properties II*

*Ltd. P'ship. (In re Danny Thomas Properties II Ltd. P'ship.) v. Beal Bank S.S.B.*, 241 F.3d 959,

962 (8th Cir. 2001), *citing In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir.1985).   "To

satisfy the feasibility requirement, the Debtors need to establish only that the Plan has a

reasonable probability of success."  *In re Apex Oil Co.*, 118 B.R. 683, 708 (Bankr. E.D.

Mo.1990).  Debtor bears the burden of establishing the feasibility of its Plan by a preponderance

of the evidence.  *Danny Thomas*, 241 F.3d at 963.

BOW argues that the Plan is not feasible based on the following factors: (1) there is no

bar date, therefore, there may be claims of which Debtor is unaware; (2) Debtor's projections are

not reliable; and (3) there is insufficient data upon which to rely regarding whether Debtor will

be able to refinance its balloon obligation at the end of the Plan period.  The Court will address

each of BOW's objections separately.

### 1. No Bar Date

BOW argues that, because the Debtor's Plan has such a "razor-thin margin for error," and

because it proposes to be a 100% payout case, that without a bar date, there could be outstanding

claims which could render the Plan infeasible.  Neither the Bankruptcy Code nor the Bankruptcy

Rules  require that debtors set a bar date for claims prior to confirmation.  BOW cites *Perry v.*

8

*First Citizens Federal Credit Union*, 304 B.R. 14 (Bankr. D. Mass.2004) for the proposition that,

a debtor "... must know, with certainty, the amount owed to creditors so as to formulate a

feasible reorganization plan."   The facts in *Perry* are distinguishable from this case.  In *Perry*,

the issue was not feasibility, but whether the Court's allowance of a claim after the bar date, by a

creditor that did not receive proper notice, was proper.  The question here is whether the Court

may confirm the Plan without a bar date.  Although *Perry* is distinguishable from this case on its

facts, the Court agrees that it is necessary for a Chapter 11 debtor to know with reasonable

certainty its universe of claimants in order to formulate a feasible plan of reorganization if it

proposes 100% payment to its creditors.  The Court believes the Debtor has established that it

does.

Debtor's response to BOW's argument that its Plan is not confirmable without a bar date

is that it knows its books and records.  The only creditor in Class 1 is BOW and that claim is

disputed.[11]   With regard to creditors listed in Classes 2 through 4, the uncontradicted evidence is

that, either by proof of claim or agreed order, the amount owed Debtor is fully and finally

determined.  With regard to members of Class 5 (general unsecured claims of non-insiders), the

evidence is that Debtor relied on its accounts payable records when filling out its schedules and,

based on said records, as of September 23, 2008, the petition date, Debtor had 55 unsecured

creditors.  Of the 55 unsecured creditors, 27 filed proof of claims or submitted amounts owed

when balloting, and that the difference between the total amount of claims submitted

($106,464.76) and the amount of claims per Debtor's accounts payable records ($97,491.09) was

---

[11] See Docket No. 247.  BOW's claim is $5,843,125 and Debtor has objected asserting that it
owes the lesser amount of $5,583,964.

9

less that $10,000,[12] an amount which Mr. Honan, II testified was immaterial with regard to

Debtor's ability to reorganize.[13]

When questioned about the approximately $10,000 worth of discrepancies in its records,

Debtor offered reasonable, plausible, explanations which support its assertion that its record

keeping was reliable and there are no outstanding claims of any significance.  For example, Flex

Box was scheduled in Debtor's accounts payable record as owing $38,3000.  Flex Box's ballot

submitted that it was owed $46,560.  The evidence is that when Debtor was preparing its records

and schedules for filing, it did not yet have the invoice from Flex Box for products that it had

just received, therefore, the last invoice which reflected the difference was not yet in its system.

There was one other difference of approximately $1,000 between an amount balloted and an

amount listed on Debtor's accounts payable records, but Debtor has not yet had time to figure

out the reason for the discrepancy.   Other than these two instances, there is no other evidence of

differences between Debtor's records and amounts claimed by unsecured creditors as being

owed.

BOW points to the $259,160.94 discrepancy between what it claims it is owed and what

Debtor claims it owes BOW,[14] and asserts that there may be numerous other discrepancies out

there which could derail Debtor's ability to pay creditors 100%.  BOW also points out that there

may be other claims similar to those of Jeffrey Orr, which involved $3.8 million in tort and

contract claims, which were ultimately dismissed when the plaintiff in that matter was paid by

---

[12] Transcript of Hearing on Confirmation and Amended Plan of Reorganization Before the
Honorable Dennis R. Dow, August 21 and 25, 2009 ("Tr"), at I-66-67.

[13] Tr. at I-73.

[14]  See Footnote No. 10.

the co-obligor pursuant to a settlement agreement.  The Court agrees that Debtor should have

included Orr's claims in its Schedules, however, this matter is settled and the Court finds it

unlikely that there is another outlying surprise creditor of substantial weight of which Debtor is

currently unaware.  Additionally, this is not an instance in which Debtor was not aware of a

claim, rather, Debtor just made an incorrect decision with regard to whether this matter needed

to be disclosed in its schedules.

There does remain a significant dispute regarding BOW's claim.  However, the

uncontradicted evidence is that, at an interest rate of approximately 5%, even if the Court finds

BOW's claimed amount is allowed at the higher amount, the plan is still feasible.  Based on the

foregoing, the Court finds insufficient evidence from which it could make an inference that

Debtor's books and records are fraught with errors or that there may be any significant

outstanding claims which could cause the Plan to founder.  The Court finds that Debtor has

provided a sufficient basis from which the Court can find that the Debtor knows the amount of

liabilities in each class of claimants.

## 2. Projections

BOW has vigorously argued throughout this process that Debtor's projections are

unreliable and the Court should  find that the Plan is infeasible pursuant to §1129(a)(11).   BOW

asserts that there is an insurmountable gap between Debtor's financial revenue projections and

its actual performance for the first six months that it has been in Chapter 11.   It believes that

Debtor's failure to meet its own projections while in bankruptcy requires a finding that the

projections for future performance must necessarily be unreliable.   BOW presented evidence at

the Confirmation Hearing, ardently argued this issue in pre and post-trial briefs and filed a post-

Confirmation Hearing motion regarding Debtor's August 2009 actual numbers, which was denied, wherein it stated that it would be "clear error" for the Court to find Debtor's projections reasonable based on the evidence.  For all the reasons set forth below, the Court disagrees.

The issue regarding feasibility and whether a debtor's projections are reasonable is not whether the success of the plan can be guaranteed.  *See Apex Oil*, 118 B.R. at 708.  Rather, the Debtor must prove that the plan "offers a reasonable prospect of success and is workable." *Id. citing Monnier Brothers*., 755 F.2d at 1341, *quoting United Properties, Inc. v. Emporium Dept. Stores, Inc.*, 379 F.2d 55, 64 (8th Cir.1967); *see also In re Trans World Airlines, Inc*., 185 B.R. 302, 317 (Bankr. E.D. Mo.1995).  To determine whether a plan is feasible, the court should analyze the debtor's projected income and expenses in relation to actual past performance. *Euerle Farms, Inc. v. State Bank in Eden Valley (In re Euerle Farms, Inc.)*, 861 F.2d 1089, 1092 (8th Cir.1988).  Other factors courts have considered when making this determination include the experience and ability of management, the adequacy of capital resources, and reasonably anticipated liquidity.  *Apex Oil*, 118 B.R. at 708 *citing United Properties*, 379 F.2d at 68-70; *In re Toy & Sports Warehouse, Inc*., 37 B.R. 141, 151 (Bankr. S.D. N.Y.1984).

The evidence shows that Debtor's borrowing relationship with BOW began with BOW's predecessor in September 2003.[15]  Debtor had just come through what its president, Richard Honan, testified was a recession, in which it reduced staff, cut expenses and closed remote offices so that the company could return to profitability and restructure its loans.[16]  Honan testified that BOW's predecessor was impressed that Debtor could make it through a recession,

---

[15] Tr. I-79.

[16] Tr. I-77-78.

change its operation and philosophy and return to profitability, which was the reason the lending

relationship began.[17]   BOW acquired its predecessor sometime in late 2005.[18]   Debtor has never

missed a single debt service payment of approximately $68,000, pre or post-bankruptcy, to

BOW.[19]   In fact, the evidence is that Debtor has been able to pay all of its post-petition debts and

expenses in the ordinary course of business and has been able to operate solely on cash

collateral, without the need of any additional debtor-in-possession financing.   The first sign of

trouble for Debtor with regard to its relationship with BOW was in the fall of 2007 when Debtor

broke one of the financial ratio covenants.[20]   Additionally, Honan testified that it was around this

time that the economy started to soften which resulted in a general decrease in revenues for

Debtor. Ultimately, BOW made the decision not to renew Debtor's lines of credit.[21]   Once BOW

pulled the plug on the lending relationship, Debtor tried to get alternative financing, but  was

faced with what BOW's expert described as one of the worst  markets he has ever seen, and

Debtor ultimately determined that reorganizing under Chapter 11 was the best option.[22]

   The parties negotiated throughout the exclusivity period, attempting to reach a mutually

agreeable resolution.   Honan testified that BOW informed Debtor that the projections it initially

proposed were too conservative and that Debtor was being unduly pessimistic about the

---

[17] Tr. I-78.

[18] Tr. I-81.

[19] Tr. I-83.

[20] Tr. I-84.

[21] Id.

[22] Tr. II-315.

13

economy in general and Debtor's business in particular.   Therefore, Debtor returned to the bank

with what Honan testified was its best-case scenario projections, which are the projections

Debtor included in its Plan and Second Amended Disclosure Statement and are, in part, the ones

currently being hotly debated by the parties.[23]

To project its overall cash-flow throughout the term of the reorganization and establish

that it will have sufficient cash-flow to service its debts, Honan testified that Debtor utilized a

formula which involves adding its "total projected income" (including equipment sales, rentals,

maintenance, etc.), deducting from this number its "projected costs to replace equipment sold"

and then deducting from that number its "projected operating expenses."[24]  To determine what

the projected numbers for each of these categories would be, Debtor had to make certain

assumptions regarding its income, expenses and the economy in general, and the question is

whether Debtor has established that its assumptions are sufficiently reasonable and reliable to

result in a successful reorganization.

The assumptions that Debtor made to make its overall projections are based on cash

reporting from sales and rentals of its portable storage containers and trailers.[25]   In making its

projections for revenue from sales, Debtor assumed that sales would decline in 2009 and 2010

based on the overall decline in the general economy.[26]  Debtor projected an increase in sales of

6% per annum for the years 2011 through 2014 because, as Honan testified, in the past during

---

[23] Tr. I-97-98; I-100.

[24] Tr. I-105-106; Debtor's Exhibit 5, Tab B-6(a), (b) & (c).

[25] Tr. I-100-101.

[26] Tr. I-101; Debtor's Exhibit 5, tab B-7.

14

economic rebounds, which Debtor is projecting will happen by 2011, Debtor has experienced a

"mad dash" for equipment, especially for over-the-road semi-trailers.[27]  Debtor's assumption

regarding an increase in sales is also based on an industry-specific journal, The North American

Commercial Truck & Trailer Outlook.[28]  Debtor's assumption that the economy will begin to

strengthen in 2011 is supported by both side's experts, each of whom testified that the general

economic prospects are looking better.[29]  Debtor's expert Anders Norlin testified that, with

regard to the portable container industry, the Midwest is a relatively stable market.[30]  He testified

that he does not know what the future will hold with regard to the health of the general economy,

but that the expectations for a better economy are better today than they were six months ago

and, based on the uncertainty of the economic climate, Debtor's projections are not

exaggerated.[31]

Regarding Debtor's assumptions related to projections for generating rental revenue,

Honan testified that he assumed the economy would not make an immediate rebound and that

Debtor's rental revenues would remain deflated for 2009 and 2010.[32]   Honan then projected a

6% increase in rental revenue for 2011 through 2014.[33]  Norlin testified that in the portable

---

[27] Tr. I-102.

[28] Debtor's Exhibit 5, tab B-7.

[29] Tr. 151 (Norlin); II-346-347 (Kim).

[30] Tr. I-151.

[31] Id.

[32] Tr. I-103.

[33] Id.

container industry, the downturn that companies experience is not from rental rate deterioration,

but rather, from a lesser demand.  Therefore, because rates generally hold up, it is both

reasonable and logical for Debtor to use the same rental rates it has in the past in its projections

going forward, and increased utilization, as a result of a stronger economy, will increase the

rental revenues.[34]

Regarding overhead projections, the largest expense being payroll, Honan testified that

Debtor's projections assume a decrease in staffing level for 2009 and then one additional

employee in 2010 and then a 4% increase each year thereafter.  The evidence is that Debtor also

looked line-by-line at all other overhead costs and made reasonable assumptions based on

current spending and cut expenses where possible.[35]

With regard to Debtor's projections for costs of goods sold, the evidence is that Debtor's

Plan has a capital expenditure component.  Both Honan and Debtor's banking expert Randall

Nay testified that the projections assume that Debtor would replace the equipment that it sells so

that the collateral cushion in the inventory would not be jeopardized.[36]  The capital expenditure

projections call for capital expenditures, including replacement costs for equipment sold, of $5.7

million over the term of the Plan.[37]   BOW disputes Debtor's projection that it will continue to

purchase new collateral so that BOW's collateral base will remain strong, and argues that it has

already sold approximately 10% of its collateral through May of 2009, and that it intends to sell

---

[34] Tr. I-141.

[35] Tr. I-105.

[36] Tr. I-104 (Honan); II-202-203(Nay).

[37] Tr. I-113; Debtor's Exhibit 5, Tab B, pg. 14 of 23.

an additional 30% of its fleet.[38] The Court will address this argument in more detail later, but finds there is insufficient evidence in the record to support BOW's argument that Debtor is selling its containers out of the ordinary course of business. The only evidence before the Court with regard to this argument is that Debtor is in the business of renting *and* selling its inventory and that it is customary to sell equipment when cash flow is weak to generate additional revenue. If Debtor has sold some equipment in the first six months of 2009, there is sufficient evidence in the record for the Court to conclude that it will use its capital expenditure budget to purchase new equipment or refurbish old equipment to ensure that its collateral base remains at or above the level that it is required to pursuant to the Plan. In fact, the evidence is that the overall fair market value of the collateral experienced a slight net increase of $3,700 (to $8,841,700 from $8,838,000) from August 2008 to the present.[39] While that increase may be minimal, it shows that even if Debtor is selling its equipment, it clearly is replacing it, or refurbishing its old equipment, thereby increasing its value, such that its overall collateral base is maintaining a fair market value that exceeds the amount owed to BOW by a significant margin.

BOW's second argument with regard to capital expenditure is that while Debtor projected to spend approximately $750,000 in capital expenditures between January and June in 2009, Debtor's Exhibit No. 10 shows Debtor has only spent approximately $170,000 on new equipment. BOW's conclusion is that Debtor has missed its capital expenditure projection by about $600,000 and the Court should therefore find that it is selling its equipment out of the

---

[38] Tr. II-323-24, II-329.

[39] Debtor's Exhibit 9.

ordinary course and that its projections are unreliable.  BOW's expert witness Roy Kim[40]

_____

[40] The Debtor objected to the admission of the report of BOW's expert Roy Kim and to his testimony on
several grounds.  First, Debtor argued that the report should be excluded based upon the timing of its production,
having been made available to Debtor's counsel only the night before the deposition of the expert.  The problem with
this argument is that the Court had not issued any pretrial orders requiring the identification of expert witnesses or
the production of their reports.  According to BOW,  Kim was retained on August 17, produced for his deposition on
August 21 and completed his report immediately before it was made available to Debtor's counsel.

Debtor also objects that  Kim indicated in his report that he had not considered the Debtor's proposed loan
structure and then testified differently at his deposition, while producing none of the working papers with regard to
those models.  Debtor argues that the report is, therefore, irrelevant and that it is unfair to permit the expert to testify
at the hearing regarding matters not included in the report or documents not produced at the deposition.  Once again,
BOW was not operating under a deadline which required it to disclose its expert or the basis of his opinion prior to
the confirmation hearing at all.  The Court is of the opinion that Debtor misunderstands what Kim meant by this
phrase in the report.  The Court believes that  Kim simply meant to say that he did not believe that the loan structure
offered by the Debtor was available in the market and that under a market set of terms, the Debtor's plan would not
be feasible.  It was for that reason that Kim did not analyze the Debtor's proposed loan structure.  To the extent that
he indicated otherwise at his deposition and Debtor had the opportunity to question  Kim about that opinion, there is
no prejudice.  Finally, as Debtor points out,  Kim conceded that at an interest rate of 5%, the Debtor's Plan is
feasible.  However, although he believes that at higher levels of interest that is not the case and testified somewhat
cryptically to that effect, because he failed to produce any documentation supporting those conclusions, the Court
finds such testimony unpersuasive.

Debtor also objects on the grounds that Kim lacks the necessary qualifications to render an opinion because
he had no prior experience in the portable storage industry.  The Court overrules this objection because it defines too
narrowly the nature of the expertise required to be an expert.  The Court does not think it necessary for an expert to
have prior experience in the precise industry under consideration for that expert's testimony to be helpful to the
Court on the issues under consideration.

Kim does have a substantial amount of experience of corporate finance and restructuring.  However,
although his opinion is not subject to exclusion, because he has absolutely no experience in or knowledge of the
portable storage industry, the Court finds his testimony considerably less persuasive than the testimony of the
Debtor's expert, Anders Norlin, and because he has no prior experience underwriting commercial loans, also
considers his testimony considerably less persuasive, on certain issues, than that of Randall Nay.

Next, Debtor objects because Kim's report supposedly acts improperly as a conduit for inadmissible
opinion testimony by others, pointing to a footnote regarding his conversations with professionals of a related entity
concerning the appropriate rate of interest.   Kim, however, testified that such information is the kind of information
upon which he frequently relies in making such decisions.  The Federal Rules of Evidence permit an expert witness
to rely upon and to testify as to such information even though it may not be admissible.  Although it may be a close
case, the Court finds that in reaching his conclusion as to the appropriate rate of interest, Kim has not acted merely
as a mouthpiece for these other professionals but employed this information as one of a number of factors in
reaching his decision.

Finally, Debtor argues that the methodology of the report is unreliable and therefore it should not be
admitted.  In support of this, the Debtor merely argues that the underlying work was done by staff members rather
than Kim.  Mr. Kim testified, however, that he reviewed the information provided regarding the Debtor, identified
the issues to be discussed in the report, ordained its general structure, supervised and directed the creation of the
models put together by his staff members and reviewed and approved the final draft of the report.  The Court does
not believe that Kim has done anything significantly different from the way in which any other expert drafts a report.
For all these reasons, the Debtor's objections to Kim's expert report and testimony are overruled.

While the Court does not believe that Kim's report is inadmissible, it does find much of Kim's testimony
unpersuasive for a number of reasons.  First, the Court is convinced that he simply does not understand the portable
storage industry and has no experience in or knowledge of the industry.  As Norlin testified, many of the comparable
companies chosen for analysis in Kim's report are in an entirely different industry, that of equipment leasing or
finance.  Second, the report bears numerous indicia of being put together very hurriedly and is riddled with errors,

18

testified that he was "concerned" about Debtor's ability to maintain its collateral base when it is

selling its equipment to meet operating expenses, an assumption Kim made regarding Debtor's

use of the proceeds from the sales.   The Court notes first that Kim's expert report assumed

Debtor was not making projections regarding capital expenditures as he did not initially see

those in the Plan, but later admitted he overlooked them.   Second, the Court is not persuaded by

Kim's analysis of Debtor's capital expenditure projections and actual numbers as he makes

assumptions which appear unsupported by the evidence.   In particular, Kim's assumption that

the Debtor is not making the required capital expenditures to replace sold inventory is based

entirely upon his observation that the Debtor has not spent as much as projected in the category

labeled "Replacement Costs of Equipment Sold" on its financial statements.   However, as the

Debtor points out, and as Honan testified, that category reflects capital expenditures of all kinds

rather than merely amounts necessary to replace equipment sold.   Accordingly, it would be

inappropriate to conclude that the Debtor is not making the necessary investment in replacing

equipment merely because it is not spending all of the money allocated to that category in its

projections.

Norlin, who specializes in financing the portable storage industry, was initially

approached by BOW to be an expert for the bank.   However, when Norlin's conclusion was that

Debtor's Plan was feasible and that BOW was better off finding a solution that allowed Debtor

---

albeit, not all major ones.  Among the ones identified in the testimony were a significant mathematical error in the
projections, references to the electronic payment processing industry, apparently a remnant from a prior report,
pasted and copied without editing into this one, and an erroneous assumption that the Debtor's projections included
no provision for making significant capital expenditures.

to continue to operate, not surprisingly, BOW did not retain Norlin as its expert.[41]   As part of his

brief services for BOW,  Norlin memorialized his conclusions in a report which stated that he

found Debtor's projections to be consistent with its historic financial performance, that its

revenue projections for 2009 through 2014 took reasonable precaution for the current economic

climate, that Debtor is a well run operation and that the personal involvement and guarantees of

Debtor's owners was further assurance that BOW would be paid its principal and interest.[42]  In a

subsequent report created by Norlin, after being retained as Debtor's expert, Norlin also noted

that Debtor is a family owned company that has been owned and managed by the family since its

inception in the early 1990's, that it is one of the 20-25 largest companies in the portable industry

nationwide and is in good standing within the industry.[43]

Debtor's projections regarding its ability to generate enough cash flow  to service its

debts are impacted by the rate of interest that the Court determines is appropriate for BOW's

claim.  Debtor initially proposed an interest rate of 3.97%, but then amended its Plan changing

the interest rate to 5% per annum or whatever rate the Court determines is appropriate.[44]  The

most persuasive evidence is that Debtor will be able to generate enough revenue to service its

debts throughout its Plan, whether the interest rate for BOW's claim is set at 5% or as high as

7%.  Norlin considered Debtor's revenue projections in connection with the total amount that

Debtor would have available for debt service (EBIDTA),  less the annual loan payments to BOW

---

[41] Tr. p. I-132-33.

[42] Debtor's Exhibit 17.

[43] Debtor's Exhibit 18.

[44] Debtor's Exhibit 26.

at interest rates ranging from 3.97% to 7%, and concluded that with the exception of 2010, at the interest rate of between 5% and 7% where Debtor has a cash flow shortage, Debtor is cash flow positive for all years and should be able to handle an interest rate of up to 7%.[45]   BOW's expert Kim even agreed that the Plan is feasible at a 5% rate of interest.[46]

With regard to the cash flow shortage in 2010, the evidence is that Debtor could overcome this problem by initiating a number of different business decisions.  First, Honan testified that Debtor has cash on hand of approximately $350,000 that could be used to service its debts in a negative cash flow month.  Honan also estimated that Debtor's cash reserve will increase by the time there is a cash flow shortage in 2010 because the third and fourth quarters have historically been Debtor's most lucrative quarters.[47]   Second, Debtor's fleet has a fair market value of $8.8 million, plus the value of the receivables which is about $400,000, for a total fair market value of about $9.2 million.[48]   Regardless of whether it is determined that BOW's claim is $5,583,964 or $5,843,125, BOW enjoys a substantial equity cushion which would allow Debtor to sell some of its inventory to supplement a short-term cashflow problem. This option is particularly attractive due to the fact that recent sales of equipment have been for up to 139% of the appraised fair market value of the equipment sold.[49]  With regard to the criticism that selling off equipment is akin to cannibalizing Debtor's own future income source,

---

[45] Debtor's Exhibit 19.

[46] Tr. II-334, II-362.

[47] Tr. I-110.

[48] Tr. I-95.

[49] Tr. I-95.

Norlin testified that is the nature of the portable industry business to use assets as a buffer for cash flow shortages. Norlin concluded that in this situation, selling off some of the equipment would not present a risk for Debtor's projections in later years.[50]  Third, Debtor could make additional personnel cuts or close branches if needed.  Debtor's banking expert testified as to some of the cost cutting measures Debtor has already taken including trimming expenses, reducing employees, closing branches and concluded that Debtor is responding reasonably to what Nay described as the worst business cycle  in 70 years.[51]

BOW's argument is essentially that actions speak louder than words.  BOW argues that the Court should find Debtor's projections unreliable based on BOW's assertion that from January 2009 through July 2009, Debtor's actual financial numbers have failed to meet its projections.[52]  Debtor argues that it has actually beaten its projections by a small margin in the second quarter and that overall its projections are reliable.  The Court finds the testimony of Debtor's witnesses Honan and Norlin to be reasonable and logical based on their knowledge and actual expertise in the industry, and far more persuasive than that of BOW's expert Kim, whose conclusions are unpersuasive for reasons already noted.  Kim's only criticism of Debtor's projection was to find fault with the assumption that the Debtor's revenues would grow in the year 2011, preferring to adopt the assumption that they would remain flat in that year as well. He, however, offers no justification for that assumption and the Court, therefore, declines to adopt it.

---

[50] Tr. I-144.

[51] Tr. II-205.

[52] Debtor's Exhibit 6.

The evidence is that the projections to which BOW refers, at least in part, were best-case scenario numbers which the Debtor never vouched for because they were inflated at BOW's suggestion during early negotiations.   Honan testified that the economy during the first quarter (January through March) remained deflated throughout the nation, therefore, Debtor was not able to reach the inflated, best-case scenario projections.   Debtor also suggests (and the Court agrees) Chapter 11 is not necessarily an ideal operating environment for a debtor as a result of conflicting demands on management time, uncertainty in the outcome of the proceeding and possible reluctance of vendors and customers to deal with a rehabilitating debtor. Honan testified that Debtor's focus on the bankruptcy and the litigation with Orr has been a significant strain on the business.   Finally, Honan testified that after the first quarter results were known, Debtor took considerable cost saving measures, including a reduction in staff by 17%, a 5% salary decrease across the board and a line-item expense cutting analysis.  These reductions, he noted, have not had time to impact its monthly financial results.[53]

As noted, Debtor contends it is actually beating its projections for the second quarter of 2009 (April through July) by a small margin.[54]  BOW objects that this result includes a $161,000 refund of professional fees and is, therefore, misleading.  In assessing these arguments, the Court will review the evidence in an attempt to evaluate the Debtor's actual operating history in comparison to its projections in a non-Chapter 11 operating environment.  In order to do that, the Court will factor out the professional fees from both the projections and the actual operating results.  Reviewing the numbers for the first six months of the year 2009 (Debtor's Exhibit 12)

---

[53] Tr. I-114- 115.

[54] Debtor's Exhibit 6.

23

shows the Debtor had projected $120,000.00 in professional fees through that date, but had incurred $177,136 in professional fees.  Actual professional fees thus adversely affected operating results by the net difference of $57,136.  Adding that back to the negative operating income shown through that time ($167,845) indicates that the Debtor missed its operating projections by $110,709 through that point.  However, the Debtor achieved significantly better operating results in the month of July.  Adjusting for the fact that the Debtor projected $20,000 in additional professional fees in that month but incurred a negative $161,766 in professional fees as a result of a partial refund of professional fees incurred by prior counsel, Debtor improved on its projected operating results in that month in the amount of approximately $48,859 (as opposed to the $230,625 shown on Debtor's Exhibit 6).  Netting these numbers suggests that the Debtor missed its projected operating income for the first seven months of 2009 by approximately $61,850, less than $9,000 per month.  The Court does not believe this demonstrates the plan is not feasible for all the reasons stated above.  In addition, the comparison of actual to projected operating results for the limited period that the Debtor is in Chapter 11 is only one of the factors the Court should consider in determining whether the plan is feasible. The Court should also and has considered the Debtor's historical prepetition performance and the validity of the assumptions underlying the projections of income and expenses.

Norlin testified that despite the uncertainty of the economic climate, he found Debtor's projections reasonable and the Plan feasible.[55]  Nay testified that despite the worst economic climate we have been faced with in probably 70 years, Debtor is still surviving.[56]  Debtor may

---

[55] Tr. I-152.

[56] Tr. II-205.

24

not have met its projections for the first three months, during one of the worst recessions this

country has seen since the Great Depression, but it has shown progress in its second quarter.

The Court finds Debtor's assumptions  reliable and reasonable.  The standard for determining

that projections are feasible is not that they guarantee success, but rather, that they tend to show

that the proposed plan is workable, and the Court finds that Debtor's projections reasonably

project a workable plan.

### 3. Balloon payment

The Plan contemplates principal and interest payments to BOW throughout the

reorganization, with a balloon payment at the end of the five-year term of the Plan.  "The

inclusion of a balloon payment is not dispositive of a plan's feasibility." *First Nat'l Bank of*

*Boston v. Fantasia (In re Fantasia)*, 211 B.R. 420, 423 (B.A.P. 1st Cir.1997).  "Confirmation of a

plan is suspect, however, unless some proof is offered to show that the funds will be available at

the time the balloon payment is due." *Id., qouting In re Gregory* 143 B.R. 424, 426 (Bankr. E.D.

Tex.1992).  To determine feasibility of a plan in which a balloon payment on a secured debt is

proposed, courts look to a number of factors.  The factors include the future earning capacity and

disposable income of the debtor, whether the plan provides for payment of interest to secured

creditors, the debtor's perseverance and motivation to execute the plan successfully, the type of

employment in which the debtor is engaged or may become engaged, whether the plan includes a

cushion for unexpected expenses, the equity in the property, whether the plan provides for

recurring charges against the property, and whether the plan provides for payments to the

creditor which will significantly reduce the debt and enhance the prospects for refinancing at the

end of the plan.  *In re Wangner*, 259 B.R. 694, 701 (B.A.P. 8th Cir.2001).

In this instance the uncontradicted evidence is that BOW enjoys a substantial equity

cushion of approximately $3 million.[57]  The evidence shows that Debtor's projections regarding

its future earning capacity are reasonable and historically based.  The Debtor's future earnings

are likely to increase as the economy strengthens, which according to the experts' testimony in

this case, should occur as early as 2011.  The Court is convinced that Debtor is motivated to

make this reorganization successful.  This is a family business that, according to the evidence, is

well respected in the industry, and despite being in bankruptcy, remains in good standing.  The

uncontradicted evidence is the Debtor has serviced its debt to BOW without incident and has

timely paid all of its postpetition expenses.  Once Debtor is no longer embattled in this

confirmation litigation, it will be able to direct all of its attention to the business and the Court is

convinced that it will do whatever it can to generate enough revenue and cut expenses to

reorganize successfully.  The Court's conclusion is buttressed by the Debtor's resolution of its

dispute with Orr, its ability to operate without postpetition financing, the fact that it has made all

of the required postpetition adequate protection payments and trimmed expenses as required.

The Plan provides for payment of interest and principal throughout the term of the reorganization

as well as provides for payment of necessary insurance, taxes and other recurring charges which

may be levied against the collateral.

The only issue in dispute regarding the balloon payment is whether Debtor will be able to

obtain a loan to refinance approximately 55%-58% (depending on the interest level) of its

remaining debt owed to BOW at the end of the reorganization.  Nay and Norlin testified that

---

[57] Tr. I-95.  Honan's testimony regarding the fair market value of the collateral as of the filing
date being approximately $9.2 million.  BOW's claim is either $5,583,964 or $5,843,125, depending on
how this claim objection is resolved.  Therefore, the equity cushion is, at a minimum, approximately $3
million.

balloon pay-off components to long-term asset loans, such as Debtor's are done with

frequency.[58]  BOW argues that the Plan is infeasible because Debtor's debt coverage ratios will

be so far out of line with banking industry standards, that it will not be able to obtain a loan.

Nay, who is currently the President of Financial Asset Resolution, LLC and formerly an

executive-level banker at various institutions for the past 17 years, testified persuasively that the

Plan is feasible even with the balloon component and even if Debtor's financial ratios are not

ideal.   In his written report, and in live testimony, Nay offered evidence which suggests that, if

Debtor is able to meet its projections, which both he and Norlin concluded was feasible, even

though Nay does not believe it is imperative that Debtor be in strict compliance with regard to

debt coverage ratios to get a loan on the balloon, its ratios actually will satisfy today's loan

requirements, or at least come close.[59]  In 2014, according to Debtor's projections, Nay

concluded that Debtor will still owe BOW approximately $3.6 million, depending on the interest

rate that the Court assigns.  Therefore, Debtor's loan-to-value ratio will be between 30%-40%,

its debt-service-coverage ratio will be about 1.55, and its debt-to-net worth will decrease

significantly and should be about 3.6.-1.[60]  Just as important, even BOW's experts admitted that

these financial covenants are not necessarily rigidly and slavishly applied, but that lenders may

be flexible, permitting a debtor some leeway in one area if its numbers are strong in another.

Nay concluded that Debtor should be able to refinance based on the amount of debt reduction

---

[58] Tr. I-144, II-212.

[59] Debtor's Exhibit 21.

[60] Tr. II-213-14; Debtor's Exhibit 21.

and likely asset values.[61]

        In addition to the Debtor's numbers looking positive for its chances to refinance the
balloon payment in five years, the evidence also supports the Court's finding that the collateral is
unlikely to decline significantly in value during the reorganization.  The useful economic life of
the collateral is very long according to Norlin; therefore, deterioration of the collateral is not a
problem in this case.  Additionally, recent sales of the equipment have been at 139% of the
appraised value, which is a very positive and strong indicator for the value of BOW's
collateral.[62]  BOW argues that Debtor has sold 10% of its fleet and that it intends to sell as much
as 30% more, and use the proceeds to fund its operations, thus, while the equipment may hold its
value, it may simply not be there when the time comes to refinance the balloon.  The problem
with this argument is that there is absolutely no evidence in the record to support the allegation
that Debtor is selling its inventory out of the ordinary course of business.  Debtor is in the
business of renting *and selling* portable container units.  Norlin testified that it was completely
normal for companies in Debtor's industry to sell off assets when in need of some additional
revenue.[63]  The only evidence in the record that even hints that Debtor may be selling its
inventory is a flyer which advertises a sale of trailers that Debtor may be having.[64]  The Court
admitted this exhibit only conditionally and as the basis for a hypothetical question to Kim
regarding the effect of selling such a percentage of Debtor's inventory.  However, BOW was

---

[61] Tr. II-213-15.

[62] Tr. II-202.

[63] Tr. I-144.

[64] BOW's Exhibit 23.

28

unable to authenticate the document or present other independent evidence of the nature and extent of the sale.   There was no evidence that a sale actually occurred, or that had a sale occurred, that it would have been out of Debtor's ordinary course of business.  BOW's theory is simply far too speculative for the Court to conclude that Debtor is attempting to secretly unload a large percentage of its inventory, especially when compared to the great weight of the evidence which is that Debtor is very motivated to reorganize.

As stated previously, Debtor's motivation is evidenced by the fact that it has not missed a single debt service payment during this bankruptcy, has not needed additional financing to pay its postpetition expenses, that its financial problems seem to be related to the economic downturn the nation as a whole is facing rather than poor management decisions and that, even if it were advertising a big sale, *it is (in part) in the business of selling trailers*.   Lastly, the Court notes that one of the modifications to the Plan, under the paragraph entitled "Events of Default" specifically deals with BOW's concerns related to maintaining the value of its collateral, states that if Debtor allows the value of BOW's collateral to fall below a certain amount, BOW may declare a default and pursue certain remedies as set forth in the Plan.  Paragraph C(4) of the Plan states that the following shall constitute a default:

> [If] The fair market value of the Collateral falls below $8,475,014 less the aggregate amount of payments made to BOW under the Plan (1) as shown in interim financial statements, or (2) upon court determination that the value of BOW's collateral has fallen below that level, or (3) if the parties agree that agree that such value has fallen below that level.

Based on the foregoing, the Court finds that Debtor has met its burden of establishing with reasonable certainty that it will be able to obtain funds to refinance the balloon payment which will come due at the end of its Plan in 2014.

29

## C. Cramdown Rate of Interest

With regard to confirmation of the Plan in this case, the cramdown rate of interest is where the major battle is being waged. Debtor's Plan proposes to pay BOW's claim at the cramdown interest rate of "5% per annum, or such other interest rate determined by the Court, based upon the evidence, to satisfy the requirements of 11 U.S.C. §1129(a)(11) and (b) ...."[65] BOW asserts Debtor's proposed rate is either too low to satisfy §1129(b)(2)(A)(I) or too high for the Plan to be feasible pursuant to §1129(a)(11).

With regard to determining the method for arriving at the proper cramdown interest rate, Debtor urges the Court to adopt the "formula" approach, as was announced as the preferred method by the United States Supreme Court in *Till v. SCS Credit Corp*., 541 U.S. 465, 477, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004). BOW asserts that the Court should be guided by the *pre-Till* Eighth Circuit cases which, it asserts, held that the "prevailing market rate" is the proper method for determining the cramdown rate of interest in Chapter 11 cases. The threshold question for the Court in this matter is to determine whether the *Till* decision, which was decided in the context of a Chapter 13 case, is controlling in the context of a Chapter 11 case on the issue of determining cramdown interest rates.

As an initial matter, a judicial cramdown is defined as when "one or more classes refuse to accept the plan." 7 Collier on Bankruptcy ¶ 1129.04 (15th ed.2005). The cramdown provisions set forth in §1129(b) allow courts, over the objections of creditors, to confirm a plan of reorganization if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

---

[65] Debtor's Exhibit 26.

11 U.S.C. §1129(b)(1).  In order for a plan to be fair and equitable to a secured creditor it must provide for one of three treatments.  First, the plan may provide that (a) the secured creditor retains its liens securing its claim, and (b) the secured creditor will receive "deferred cash payments totaling at least the allowed amount of [its] claim ..., as of the effective date of the plan, of at least the value of [its] interest in the estate's interest in [the collateral]." *See* 11 U.S.C. § 1129(b)(2)(A)(i)(I) and (II).  Second, the plan may provide for the sale of the collateral subject to the liens of the secured creditor.  *See* 11 U.S.C. § 1129(b)(2)(A)(ii).  Third, the plan may provide for the realization by the secured creditor of the indubitable equivalent of its claim.  *See* 11 U.S.C. §1129(b)(2)(A)(iii).

In this case, although BOW is asserting that its lien has been stripped, an argument which the Court addresses in ¶ D of this opinion, the Court is faced with the first situation, in which BOW is retaining its lien and, therefore, needs to be paid the present value of its allowed, secured claim, or the Plan cannot be confirmed over its objection.   The issue is whether the proposed deferred payments in Debtor's Plan will provide BOW with the present value of its interest in the collateral.

The cramdown provisions of § 1129(b), however, provide no guidance regarding how bankruptcy courts are to calculate the appropriate cramdown interest rate, and this has proven to be a arduous task.  Bankruptcy courts have announced a number of different methods for

determining cramdown interest rates, which has fueled much litigation in this area.[66]   The

question squarely before this Court is whether the formula approach or the "prevailing market"

approach is the proper method for determining the cramdown rate of interest for BOW's secured

claim.

    The United States Supreme Court in *Till* embraced the formula approach as the preferable

method for determining the cramdown interest rate, announcing that it "entails a straightforward,

familiar, and objective inquiry, and minimizes the need for potentially costly additional

evidentiary proceedings." *Till,* 541 U.S. at 479.   The formula approach begins by looking to a

national prime rate,[67] reported daily in the press, which reflects the financial market's estimate of

---

[66] The different methods that  bankruptcy courts have embraced include: (1) the coerced loan approach,  (2) the presumptive contract rate approach, (3) the cost of funds approach, (4) the formula approach and (5) the market rate approach. (The formula and market approach will be addressed in the opinion)

    Under the coerced loan approach, the court treats any deferred payment of an obligation under a plan as a coerced loan, and the rate of return that would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk.  *In re Deep River Warehouse, Inc.,* 2005 WL 2319201 (Bankr. M.D. N.C.); *see also Till,* 541 U.S. at 477 ("[T]he coerced loan approach requires bankruptcy courts to consider evidence about the market for comparable loans to similar (though nonbankrupt) debtors-an inquiry far removed from such courts' usual task of evaluating debtors' financial circumstances and the feasibility of their debt adjustment plans.").

    The presumptive contract approach uses the negotiated contract rate between the parties, subject to adjustments based on the particular facts of the case.  *Deep River Warehouse,* 2005 WL at 9.  In *In re Monnier Bros.,* 755 F.2d 1336, 1338 (8th Cir.1985), the Eighth Circuit applied the presumptive contract method because only 20 months had elapsed between the time the contract was executed and the time the plan was confirmed, the terms of the contract were identical to those in the proposed plan and there was insufficient evidence in the record regarding what the prevailing market rate was.

    The cost of funds method requires a determination of the cost that the creditor would incur to obtain the cash equivalent of the collateral.  *Deep River Warehouse,* 2005 WL at 9.

[67] A prime rate is an administered rate established by each bank.  A "national" prime rate is published in the *Wall Street Journal* as the base rate on corporate loans posted by at least 75 percent of the nation's largest banks.  As the Supreme Court in *Till* acknowledges, it already includes some adjustment for the risk of borrower default, albeit the very low default risk associated with commercial borrowers with excellent credit.  *See* Ronald F. Greenspan and Cynthia Nelson, *"UnTill" We Meet Again, Why the Till Decision Might Not be the Last Word on Cramdown Interest Rates,* 23-JAN Am. Bankr. INST. J. 48 (2005).

the rate that a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the risk of default. *Id.* Because bankruptcy debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. *Id.* The plurality recognized that courts have generally approved a risk premium of 1 to 3%. *Id.* at 480.

*Till* involved a Chapter 13 case, and the Supreme Court was not called upon to determine whether its holding applied to Chapter 11 cases.  In fact, its holding is less than clear regarding its applicability in the Chapter 11 context.  On the one hand, the plurality noted the likelihood that Congress intended the same approach to be applied in Chapter 11 cases when it noted the similarity in language in various sections of the Code. *Till*, 541 U.S. at 474-75 ("... Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions.")  In this regard, the Court cited to present value provisions in sections 1129(a), 1129(b), 1173(a), 1125(a) and 1228(b) *Id.* at 475 n. 10.   The plurality went on to suggest the probability that "Congress would favor an approach that is familiar in the financial community and that minimizes the need for expensive evidentiary proceedings." *Id.* at 474.   This language could be interpreted to mean that *Till's* analysis of Chapter 13 cramdown interest rates should extend to Chapter 11 cases.  However, the Supreme Court then went on to note in footnote no. 14 in the opinion the following:

> This fact helps to explain why there is no readily apparent Chapter 13 'cramdown market rate of interest':  Because every cramdown loan is imposed by a court over the objection

> of the secured creditor, there is no free market of willing cramdown lenders.
> Interestingly, the same is *not* true in the Chapter 11 context, as numerous lenders
> advertise financing for Chapter 11 debtors in possession.... Thus, when picking a
> cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient
> market would produce.  In the Chapter 13 context, by contrast, the absence of any such
> market obligates courts to look to first principles and ask only what rate will fairly
> compensate a creditor for its exposure.

*Till*, 541 U.S. at 477, n. 14.[68]  This footnote suggests that the formula approach is not required in

the Chapter 11 context and that if an "efficient market rate" exists, it may be the most

appropriate method for determining cramdown interest rates in Chapter 11 cases.

Whether to apply the holding in *Till* in Chapter 11 has caused much debate among

commentators in the legal community.[69]  Few published decisions have addressed this issue, but

there does appear to be continuity among the decisions from those courts that have.  The Sixth

Circuit was one of the earliest courts to opine on which methodology was preferred for

determining interest rates in a Chapter 11 context post-*Till*. *See Bank of Montreal v. Official*

*Committee of Unsecured Creditors (In re American HomePatient, Inc.)*, 420 F.3d 559 (6th

Cir.2005).

In *American Home Patient*, the Bankruptcy Court relied on cases decided pre-*Till*,

---

[68] The Court's observation about the existence of debtor-in-possession financing as indicative of a market useful in identifying an appropriate cramdown rate of interest is somewhat puzzling.  Lenders providing financing for debtors-in-possession do not do so involuntarily.  They provide financing for a limited period of time and usually on highly favorable terms as a result of the debtor's limited options.  They may or may not become providers of exit financing, but even exit financing is not involuntary as is the "loan" made on confirmation of a plan of reorganization over the objection of a dissenting secured creditor.

[69] *See e.g.* Richard E. Mikels and Adrienne K. Walker, *The Developing Impact of Till V. SCS on Chapter 11 Reorganizations*, 24-JAN AM. BANKR. INST. J. 12 (2006); Ronald F. Greenspan and Cynthia Nelson, *"UnTill" We Meet Again, Why the Till Decision Might Not be the Last Word on Cramdown Interest Rates*, 23-JAN Am. Bankr. INST. J. 48 (2005); 7 Collier on Bankruptcy ¶1129.06[1][c][I] (Alan N. Resnick & Henry J. Somer eds., 15th ed. Rev. 2004) ("The relevant market for involuntary loans in chapter 11 may be just as illusory as in chapter 13.").

determined that the proper method for obtaining the cramdown interest rate was the coerced loan

approach, and proceeded to determine the interest rate pursuant to that method. *American

HomePatient*, 420 F.3d at 566. The secured party objected, arguing that the decision in *Till*

rendered use of the coerced method improper. *Id*. The Sixth Circuit considered the ramifications

of *Till's* holding in a Chapter 11 context and ultimately found that in a Chapter 11 case, if an

efficient market exists, it should be used to determine the cramdown rate of interest. However,

where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should

employ the formula approach endorsed by the *Till* plurality. *American HomePatient*, 420 F.3d at

568. The Sixth Circuit reasoned that this nuanced approach to applying the *Till* decision in a

Chapter 11 context should appease those concerned with the plurality's comment in footnote 14

regarding there often being an efficient market, in Chapter 11, when in fact, in many Chapter 11

cases, just as in Chapter 13, there is no such efficient market. In those instances the court will

simply fall back on the formula approach to determine the cramdown rate of interest.

 The other courts that have addressed this issue post-*Till* have adopted the same, or a

similar nuanced approach to determining *Till's* applicability to Chapter 11 cases. *See e.g. In re

Prussia Associates*, 322 B.R. 572 (Bankr. E.D.Pa.2005) (although the Bankruptcy Court found

that an efficient market existed, because there was an insufficient evidentiary basis about the

availability of market financing, the Court defaulted to the formula approach); *In re Deep River

Warehouse, Inc*., 2005 WL 2319201 (Bankr. M.D. N.C.) (Bankruptcy Court announced its intent

to apply the formula approach, went through the motions of applying the formula, and then

concluded the opinion by stating that its resultant interest rate represented the "market interest

rate." ); *In re Cantwell*, 336 B.R. 688 (Bankr. D. N.J.2006) (court held that in the absence of

evidence of an efficient market, court would use formula approach to calculate appropriate

cramdown rate of interest); *In re Northwest Timberline Enterprises, Inc*., 348 B.R. 412 (Bankr.

N.D. Tex.2006) (Court will not mechanically apply the formula approach in a Chapter 11, but

will consider whether there is an efficient market, and if there is not, fall back to the formula

approach); *General Electric Credit Equities, Inc., v. Brice Road Dev., L.L.C. (In re Brice Road*

*Dev., L.L.C.),* 392 B.R. 274, 280 (BAP 6th Cir.2008) (Court found that an efficient market

existed, so there was no need to resort to the formula approach); *In re Dargahi*, 2008 WL

618954 (Bankr. C.D. Ca.) (Post-*Till* case which applied the formula approach with no mention of

*Till* or any other possible acceptable approach for determining cramdown interest rate.)

The Court will take its cue from the language contained in footnote no. 14, which

suggests that in Chapter 11, it might make sense to consider whether there is an efficient market,

but if there is not, the formula approach is proper and provides a fair and objective calculation of

the cramdown rate of interest.

The Court also believes this approach is also in line with pre-*Till* Eighth Circuit

jurisprudence.   In the Eight Circuit, there are five cases which each ultimately hold that the

"prevailing market" approach is the proper method for determining the cramdown rate of

interest.  The use of the language "prevailing market rate," however, is perhaps a misnomer

because none of these cases actually involves an analysis of factors driven by the competitive

marketplace.  Rather, in each case, the courts seem to give lip-service to the term "market rate"

but in actuality, what the courts have done, except in *Monnier,* is either apply the formula

approach to determine the cramdown rate of interest, or remand the case for determination of the

"market rate" of interest.

36

In *Monnier Brothers*, the Eighth Circuit found that application of the "prevailing market rate" of interest was appropriate in Chapter 11 cases.  However, because the parties presented insufficient evidence of a prevailing market, the Court ultimately applied the contract rate of interest.  *Monnier,* 755 F.2d at 1399.

In *United States v. Neal Pharmcal Co. (In re Neal Pharmcal Co.)*, 789 F.2d 1238 (8th Cir.1986), the Eighth Circuit was called upon to determine whether the Internal Revenue Code's statutory rate of interest on federal tax claims was the appropriate market rate of interest on a priority tax claim in bankruptcy.  The Eighth Circuit found that the IRC's statutory rate had some relevance in determining the prevailing market rate, but that it could not be adopted as a per se rule.  *Id*. at 1288.  Before concluding that the statutory rate will provide the government with the present value of its federal tax claim, the court "must first consider the payment period, the quality of the security, if any, and the risk of default in the particular case." *Id*.  The case was remanded so that the bankruptcy court could determine the appropriate interest rate in light of the evidence and the factors set forth in the Court's opinion. *Id*. at 1289.

In *United States v. Doud (In re Doud)* , 869 F.2d 114 (8th Cir.1989), the Eighth Circuit concluded that the "market rate" approach was applicable in Chapter 12 reorganizations. *Id*. at 1145.   The *Doud* Court then approved the Bankruptcy Court's method of determining the "market rate" in that case which started with the interest rate for a riskless investment, such as treasury bill, for a term equal to the payout period proposed in the plan, and then made an upward adjustment to that rate by 2% to account for the risks.  *See Doud*, 869 F.2d at 1145.  This Court notes that the method used in *Doud* for determining the "prevailing market rate" is remarkably similar to *Till's* formula approach.

37

In *USDA v. Fisher (In re Fisher)*, 930 F.2d 1361 (8th Cir.1991), the Eighth Circuit

considered whether the debtor should pay its FMHA claims based on the below-market

subsidized contract rate of interest or at the "market rate" as of the date of filing. The Eighth

Circuit found that the FMHA "enters the bankruptcy proceedings the same as any other creditors

and is thus entitled to have its claim valued using a discount rate based not on the contract rate of

interest, but on the "market rate" of interest." *Id.* at 1363.  Because the issue of how the "market

rate" should be determined had not been adequately briefed, the case was remanded. *Id.* at 1364.

The Eighth Circuit suggested that factors other than those suggested in *Doud*, such as the nature

of the loan, could be considered when determining what the "market rate" is. *Id.*

The case of *United States v. Roso (In re Roso),* 76 F.3d 179 (8th Cir.1996) is similar to

*Fisher* in that the Court was asked to determine whether a subsidized FMHA contract rate could

be considered a market rate and the Court concluded that it could not.  The Eighth Circuit held

that the Bankruptcy Court erred in awarding a cramdown rate of interest that was based in part

on a subsidized interest rate.  *Id.* at. 181.

Many courts in this jurisdiction have interpreted the law in the Eighth Circuit to be that

the "market approach" is essentially the "formula approach."  These Courts have found that the

prime-plus or formula method is the most fair and objective method for calculating the

cramdown rate of interest in the Chapter 11 context.  Generally, these courts start with a riskless

rate of interest (typically the applicable treasury bill rate or the prime rate), and then adjust

upward for risk.   *See e.g. Doud*, 869 F.2d at 1145; *In re Value Recreation, Inc*., 228 B.R. 692

(Bankr. D. Minn.1999); *In re Kellogg Square P'ship*., 160 B.R. 343, 368 (Bankr. D. Minn.1993);

*In re Noe*, 76 B.R. 675, 677-79 (Bankr. N.D. Iowa 1987); *In re E.I. Parks No. 1 Limited P'ship*.,

122 B.R. 549, 553 (Bankr. W.D. Ark.1990) (citing numerous cases).

Based on the somewhat confusing and loose use of the term "prevailing market rate" in the Eighth Circuit, this Court finds that it is on firm ground to adopt the nuanced version of *Till* in the Chapter 11 context, which involves first considering the existence of an efficient market and if there is not one, then resorting to the formula approach.  There is no evidence of an efficient market in this case.  BOW's expert witness, Kim, testified that this is one of the worst markets that he has seen.[70]  With regard to what the market rate of interest would be for a company in Debtor's general financial condition, Kim testified that for Debtor to obtain a loan with a 5-year term, a 10-year amortization, resulting in a balloon payment for the remaining balance, it would take what he called a "loan to own" or a "hard money lender" to step in, likely an injection of some equity, and a minimum 10% interest rate which could go as high as 12% to 18%.[71]  Kim described the type of loan as being one where the lender has a "clear expectation that there will be a default and [the lender] will own [the collateral]."[72]  Both Kim and BOW's company expert, Jefferson Keyes, agreed that there did not exist a willing market of cramdown lenders, other than the hard money type of lenders, for a Chapter 11 loan of the type that is at issue in this case.[73]  The Court finds BOW's evidence on this issue utterly inconsistent with the very basic nature and spirit of Chapter 11.  Telling debtors that the only way to pay creditors the present value of their claim is to submit to vulture lenders, who lay in wait, charging sky high

---

[70] Tr. II-315.

[71] Tr. II-308.

[72] Tr. II-339.

[73] Tr. II-270 (Keyes) and II-338 (Kim).

interest rates, just waiting for the debtor to default so they can swoop in and liquidate the

collateral, is akin to holding that no Chapter 11 cramdown is feasible.  *See E.I. Parks*, 122 B.R.

at 554 ("When asked what rate they would charge for a hypothetical coerced loan, lenders

invariably state that the rate charged would be the maximum allowed by law.  Calculating the

market rate of interest solely from the viewpoint of a coerced loan tends to jeopardize the

success of a Chapter 11 plan and defeat the rehabilitative purposes of bankruptcy

reorganization.")   Hard money lenders, charging upwards of 12% to 18%, generally are not

going to be appropriate options for debtors in bankruptcy.  Not only does such an interest rate

give the lender a windfall, but it flies in the face of what Congress intended when it drafted

§1129(b)(2)(A)(i)(I) and (II), which is to give lenders the time value of their money.  The Court

finds that there is no "efficient market" in this case, therefore, it is necessary to fall back on the

formula approach to determine the cramdown rate of interest.

   The Court is on firm ground in applying the formula approach to determine the

cramdown rate of interest for BOW's secured claim, either based on the post-*Till* trend of cases

and the overwhelming and uncontradicted evidence of a lack of an efficient market in this case

or based simply on long standing Eighth Circuit precedent.  In applying the formula approach to

this case, the Court begins by observing that the base rate should be determined by the national

prime rate as set forth in the *Wall Street Journal*.  This rate should be determined as of the date

of confirmation to satisfy the requirement that the secured creditor receive the present value of

its claim as of the effective date of the plan.  *Noe*, 76 B.R. at 678; 11 U.S.C.

§1129(b)(2)(A)(i)(II).  The evidence in the record establishes that the national prime rate of

40

interest rate on August 14, 2009 was 3.25%.[74]

Once the prime rate has been established, the Court turns to determination of the percentage of interest necessary to boost that rate to account for the risk that the claim might not ultimately be satisfied.

> In general...the binding Eighth Circuit precedent requires the proponent of the plan to identify a rate of interest that could be earned on a risk-free investment, such as that currently paid on a United States treasury bond of like term, and then to augment that rate by an increment that is sufficient to compensate the secured creditor for the risk it will bear over the term of the reamortization, as a result of the reorganized debtor's retention of the possession of the collateral.

*Kellogg Square*, 160 B.R. at 363 *citing Doud*, 869 F.2d at 1146; *Monnier Bros.*, 755 F.2d at 1339. Nay, whose credentials include twenty-plus years in the banking industry, testified that he reviewed the Plan and that he believes the proper method for determining the interest rate in this case would be to start with either a risk-free rate of interest such as a Treasury bill or a prime rate and then make adjustments for risks.[75] The risk factors Nay considered to reach his conclusion that an interest rate of 5% would be appropriate, closely mirror those identified by the Eighth Circuit in *Monnier*, and include: the Debtor's ability to pay under the Plan, the collateral

---

[74] See Debtor's Exhibit 15. The Debtor also introduced evidence of the interest rate on treasury bills of different terms. Debtor's Exhibit 25. That evidence indicated that the rate of interest as of August 20, 2009, on a five-year treasury bill was 2.43% and on a 10-year bill was 3.42%. Neither rate is clearly applicable. While the term of the restructured BOW loan under the Plan would be five years, it would not fully amortize over that period of time, there being a substantial balance and a balloon payment due at that point. Neither is the ten-year rate clearly appropriate because although the loan amortizes on a ten-year schedule, it would be payable in full in half that time. Melding the two rates would yield a suggested interest rate of approximately 3%. As noted, the prime rate as of the date of the confirmation hearing was 3.25% and includes, as previously observed, some element of risk of default, although of an unspecified amount. The point is that starting with the truly riskless treasury bill rate or with the prime rate which includes a small but unspecified amount of risk will not yield a significantly different result in this case. The Court uses the prime rate as the starting point because that is what the Supreme Court does in *Till* and because, even though the lower rate would benefit it, the Debtor adopts this approach.

[75] Tr. II-196-205.

coverage, and the ability to maintain that collateral coverage throughout the plan.[76]   Regarding

Debtor's ability to service its debt throughout the Plan, Nay looked at the history of the company

and observed that it has been relatively stable for the last seven years. He determined that the

projections were realistic and had historical support.[77]   The evidence supports the Court's finding

that Debtor shows motivation to succeed in that it has not missed a single debt service payment

and has paid all postpetition expenses without the need to seek additional outside financing.

According to Norlin's expert report, the management is well respected in the portable storage

container industry and its involvement and personal guarantees offer further assurance that the

company is motivated to make its payments and reorganize successfully.[78]   The Court finds that

Debtor has a strong commitment to the continuing success of this company and that this is not a

risk.

   Collateral coverage and maintenance are similarly not factors which would warrant an

increased interest rate in this case.  According to Norlin, the useful economic life of the

containers and trailers in Debtor's business far exceeds that used in the typical depreciation

schedules, therefore, BOW is not in jeopardy of losing its collateral coverage due to the passage

of time.[79]   Additionally, the Court finds BOW is not in danger of losing its collateral coverage

due to Debtor selling it in order to generate cashflow as there is no evidence that Debtor is

selling its inventory out of the ordinary course of business.  To the contrary, Nay observed that

---

[76] Tr. II-198-99.

[77] Tr. II-200-201.

[78] Debtor's Exhibit 17.

[79] Tr. I-140; Debtor's Exhibit 18.

Debtor is maintaining its collateral, as the Plan accounts for capital expenditures.  In fact, the fair

market value of the collateral increased just slightly between August 2008 and the present, which

is evidence that the collateral value is being maintained.[80]   BOW enjoys a substantial equity

cushion and its secured status is unlikely to deteriorate over the payout period.  The Plan also

provides BOW with protection by including a provision which specifically states that Debtor

must maintain the fair market value of BOW's collateral at a certain level or BOW will have the

right to declare a default and pursue its remedies as set forth in the Plan.[81]

The pay out period is five years and Nay testified that this term justifies a higher interest

rate, therefore, the Court will increase the prime rate for the length of the pay out term.[82]  The

Plan also includes a balloon payment, which although the Court finds does not render the Plan

infeasible, does increase the risk associated with potential default, therefore, it will increase the

interest to compensate for the risk associated with the balloon component of the Plan.  Finally,

while the Court finds it necessary for the Debtor to successfully reorganize to allow it to modify

the loan documents, because the Court acknowledges this poses some additional risk, the Court

will increase the interest rate based on this modification.  The Court finds that a 5.50% rate of

interest appropriately accounts for the  risks associated with the Plan, provides BOW with the

value of its interest in Debtor's collateral and helps facilitate the reorganization of the Debtor.

### D. Loan Covenants and BOW's Lien

Section 1129(b)(2)(A)(i)(I) requires that BOW retain its lien to the extent of the allowed

---

[80] Debtor's Exhibit 9.

[81] See Debtor's Exhibit 26 ¶ C(4).

[82] Tr. II-197.

amount of its claim.  The Plan specifically provides that BOW will retain its lien.[83]  However,

BOW argues that because the Plan does not include all of the financial ratio covenants that were

included in the original loan, and because there is not a covenant which prohibits Debtor from

selling equipment without BOW's permission,[84] that BOW was essentially stripped of its lien

and is left with nothing more than a naked security interest.  "The covenants to be included in the

loan documents of a cramdown need not precisely track the covenants in the parties' existing

loan agreement."  *In re P.J. Keating Co.*, 168 B.R. 464, 473 (Bankr. D. Mass.1994) *quoting In re*

*Western Real Estate Fund, Inc.*, 75 B.R. 580 (Bankr. W.D. Okla.1987); *see also In re Stratford*

*Assoc. Ltd. P'ship.*, 145 B.R. 689, 703 (Bankr. D. Kan.1992) (finding that if a debtor could not

modify loan documentation it would make the whole reorganization process unworkable).  None

of the cases cited by BOW support its assertion that the Debtor may not alter the prepetition loan

documents or that the Court must require that the postconfirmation loan documents be consistent

with what the market would require for a new loan.  The Court finds that the question of whether

modification of loan documents is appropriate requires consideration of the following factors: (1)

whether the proposed terms and covenants unduly harm the secured creditor with respect to its

collateral position; and (2) whether the inclusion of terms and conditions from the pre-

bankruptcy loan documents would unduly impair the debtor's ability to reorganize.

    There is no reliable evidence in the record to support BOW's argument that the absence

of financial ratio covenants would impair BOW's strong collateral position.  While the evidence

---

[83] Debtor's Exhibit 26, p. 2 ¶B.

[84] Debtor's Amendment to the Plan, at ¶E, originally included a condition that would require
BOW to seek a Court order prior to exercising its rights after a default, however, in a subsequent
amendment to the Plan, Debtor removed that condition.

is that the inclusion of such covenants is customary, at least in the case of new loans, and that

they are helpful for the lender in monitoring a debtor's financial condition, there is no testimony

that they are crucial to maintenance of the lender's collateral position.  While it is true that

collateral protection in a bankruptcy situation is imperative, in this case, not only does BOW

enjoy a substantial equity cushion of about $3 million, but the Plan contains terms and

conditions, specifically the "Events of Default" provisions,[85] which the Court finds are more than

sufficient to protect BOW's collateral.  Paragraph C(4) specifically states as follows:

> The fair market value of the Collateral falls below $8,475,014 less the aggregate amount
> of payments made to BOW under the Plan (1) as shown in interim financial statements,
> or (2) upon Court determination that the value of BOW's collateral has fallen below that
> level, or (3) if the parties agree that such value has fallen below that level.

If BOW determines that Debtor is selling its inventory out of the ordinary course of business,

such that it is in default of paragraph C(4) of the Plan, BOW may immediately declare a default

and pursue its remedies as set forth in the Plan.  In addition to being required to make monthly

payments to BOW and maintain and insure the collateral, Debtor is bound by a number of other

traditional covenants including periodic financial reporting.  BOW is given a variety of

traditional remedies upon default including the right to accelerate the indebtedness, require

assembly of the collateral, sell it and apply the proceeds to the debt, and other rights and

remedies available under the Uniform Commercial Code as well as more unconventional

remedies such as the appointment of a receiver.

The Court is similarly unpersuaded by BOW's argument that, absent a covenant

prohibiting Debtor from selling equipment without BOW's consent, that its collateral position

---

[85] Debtor's Exhibit 26, ¶C(1) - (6).

will be unduly harmed.  Debtor is in the business of renting *and selling* its equipment.  There is

no reliable evidence in the record that Debtor is selling its equipment out of the ordinary course

of business.  The Court finds that inclusion of such a sales restriction in this case, especially in

light of the litigious nature of the case thus far, would likely result in disagreements regarding

which sales were within the ordinary course and which ones were not, which would ultimately

require future, and perhaps multiple instances of, judicial interpretation.  Rather, the Court is

convinced that the protections the Plan currently has in place to preserve the collateral, in

addition to the substantial equity cushion that BOW enjoys, and the default provisions included

in the amendments to the Plan, are more than sufficient to alert BOW to any significant change

in inventory so that if necessary, default may be declared and BOW may exercise its rights to

protect its collateral.   Additionally, Debtor has added yet another amendment to its Plan which

specifically states that it will agree to use its best efforts to notify BOW in advance of any

material sales it determines to be outside its ordinary course of business.[86]

Relying on *New Midland Plaza Associates,* 247 B.R. 877, 892 (Bankr. S.D. Fla.2000),

BOW argues that inclusion of financial ratio covenants and the sales restriction covenant is

necessary because they are customarily used in loan transactions.  BOW's reliance, however, is

misplaced.  In *New Midland*, the Court heard expert evidence that certain covenants contained in

the debtor's loan documents were restricting cash flow and potentially would impair debtor's

ability to consummate its plan.  Based on said evidence, the Court  found that the "the loan

documents may be modified as reasonably necessary to conform to loan documents customarily

used in the commercial real estate mortgage market in the State of Tennessee." *New Midland*,

---

[86] See ¶15 of Debtor's Second Amendment to First Amended Plan.

247 B.R. at 892.   The issue was not whether the terms of the debtor's prepetition loan

documents conformed to terms customarily used in a certain industry, but rather, whether

inclusion of said terms unduly impaired the debtor's ability to reorganize.  Because the *New

Midland* Court determined that inclusion of the prepetition terms in those documents would

impair that debtor's ability to reorganize, much like inclusion of the financial ratio covenants

which are at issue between Debtor and BOW would likely doom Debtor's reorganization, it

found that reasonable modification was necessary.

As in *New Midland*, this Court finds that if the financial ratio covenants are left in the

Plan, they would  impair Debtor's ability to reorganize.  In this case, the evidence is that if the

Court were to require the Plan to include the financial ratio covenants which BOW seeks to

include, Debtor would be in default as soon as it emerged from bankruptcy.  The Court finds that

slavish adherence to the financial ratio covenants included in the parties original loan documents

or inclusion of a sales restriction covenant, would unnecessarily impair Debtor's ability to

reorganize and potentially be a drain on this Court's resources.  The Court further finds that the

amendments Debtor has made to its Plan satisfactorily address BOW's concerns regarding

protecting its collateral and that BOW's lien remains intact.


**E. Discrimination**

In order to be confirmable pursuant to 11 U.S.C. § 1129(b)(1), the Plan must not unfairly

discriminate between similarly situated creditors.  "A plan discriminates unfairly 'only if similar

claims are treated differently without a reasonable basis for the disparate treatment'."  *In re

Hoffinger Indus., Inc.*, 321 B.R. 498, 505 (Bankr. E.D. Ark.2005); *see also Corestates Bank,*

*N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33, 47-48 (Bankr. E.D. Pa.1996) ("A plan

that [discriminates] unfairly gives unequal treatment to creditors who are similarly situated

regarding legal rights and priority.")

BOW argues that the Plan unfairly discriminates between it and the other classes of

creditors by stripping it of its financial ratio covenants and by proposing differing interest rates.

In determining whether or not unfair discrimination exists under a Chapter 11 plan, courts have

applied the following  four-part test, which requires that : (1) a reasonable basis for the

discrimination exist; (2) the debtor cannot consummate its plan without discrimination; (3) the

discrimination is proposed in good faith; and (4) the degree of discrimination is directly

proportional to its rationale.  *Mickelson v. Leser (In re Leser)*, 939 F.2d 669, 672 (8th Cir. 1991);

*Apex Oil*, 118 B.R. at 711.  Unlike unsecured claims, each and every secured claim may be

treated differently.  The Court in *In re Buttonwood Partners* stated

> Unlike unsecured claims, every secured claim is different.  Secured claims usually are
>
> secured by different collateral and usually have different priorities even if secured by the
>
> same collateral.  This fact leads to the permissibility of individualized treatment based on
>
> the particularities of each secured claim.

*In re Buttonwood Partners*, Ltd., 111 B.R. 57 (Bankr. S.D. N.Y.1990).  If there is a reasonable

basis for disparate treatment, there is no unfair discrimination.  *See In re Union Financial*

*Services Group, Inc.*, 303 B.R. 390 (Bankr. E.D. Mo.2003).

In this case, the collateral which secures BOW's claim is a fleet of portable storage

containers and trailers which has a fair market value of approximately $9.2 million.  Debtor's

inventory of containers and trailers secures a loan of either $5,583,964 or $5,843,125, depending

on how the Court resolves Debtor's objection to BOW's claim.   The Plan proposes to amortize

BOW's loan over 10 years at the interest rate of 5%, or a rate to be determined by the Court,

with a balloon payment of the remainder due at the end of the bankruptcy, five years.   In stark

contrast, the collateral which secures the loans of Debtor's other secured creditors is motor

vehicles and the Plan proposes to pay these creditors as follows:

> (a) Union Bank & Trust Company–$24,377.97 amortized over five years at the contract rate of 7%.

> (b) J.P. Morgan Chase Bank, NA-$8,660.14 amortized over five years at the contract rate of 7.89%, and $11,113.82 amortized over five years at the contract rate of 5.74%.

> (c) GMAC-$5,405.54 amortized over five years at the Chapter 13 rate of 4.71%.

The Court finds an abundant amount of evidence to support its finding that there are sufficient

differences between BOW and Debtor's other secured creditors to justify the proposed disparate

treatment under the Plan.  As Debtor points out in its trial brief, the only readily apparent

similarity between BOW and Debtor's other secured creditors is their secured status.  In contrast

to BOW, the other secured creditors all have: (1) very small loans to Debtor compared to BOW's

$5.5 million or more loan; (2) motor vehicles as collateral; (3) collateral which will depreciate on

a much faster basis than Debtor's fleet of portable containers and trailers;[87] (4) a similar purpose

being to provide Debtor the funds to purchase a vehicle versus BOW's purpose which is to fund

Debtor's entire business operation; and (5) loan terms and interest rates that do not impair the

Debtor's ability to reorganize.   Comparing BOW to Debtor's other secured creditors is like

comparing apples to oranges.  The Court finds that a reasonable basis exists in this case to treat

---

[87] See *Elk Creek*, 286 B.R. at 395 (finding different treatment of secured claims permissible at least in part based on nature and value of collateral in Chapter 12 case).

BOW differently than the other secured creditors.  Additionally, the Court notes that, due to the

minimal impact that Debtor's other loans have on its reorganization, there was little, if any,

incentive to spend resources litigating interest rates or inclusion of various loan covenants.  It

made more sense from a business perspective to focus on the loan that had the most impact on its

reorganization, i.e. BOW's loan.  To find that all of Debtor's creditors needed to retain all the

covenants contained in their original loan documents and have their originally negotiated interest

rates would essentially be a finding that Debtor may not reorganize as it would not be able to

confirm a plan.  The Court finds the disparate treatment of secured creditors both reasonable and

necessary under the facts of this case.

## III.  CONCLUSION

Accordingly, for the foregoing reasons, the Court finds that the Debtor's Plan is

confirmed.

A separate order will be entered as required by Rule 9021.


Dated:    November 9,  2009            /s/ Dennis R. Dow
                                      THE HONORABLE DENNIS R. DOW
                                      UNITED STATES BANKRUPTCY JUDGE


Copies to:
Lisa Epps
Eric Johnson
Barry Pickens
Michael Fielding
Ben Mann

50